COURT OF APPEALS OF VIRGINIA


Present:   Judges Annunziata, Kelsey and Senior Judge Overton
Argued at Salem, Virginia


RICKY L. PRUITT, SR., A/K/A
  JAMES RICKY PRUITT, SR.
                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0651-03-3          JUDGE ROSEMARIE ANNUNZIATA
                                                    SEPTEMBER 28, 2004
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Charles J. Strauss, Judge

Charles C. Cosby, Jr. (Boone, Beale, Cosby & Long, on brief), for
appellant.

John H. McLees, Senior Assistant Attorney General (Jerry W.
Kilgore, Attorney General, on brief), for appellee.


James Ricky Pruitt, Sr. was convicted of two counts of causing his sixteen-year-old son

to assist him in distributing marijuana in violation of Code § 18.2-255.  He appeals his

convictions, arguing they should be reversed because the trial court improperly excluded

testimony regarding admissions made by his son on the ground that it constituted hearsay.

Finding no error, we affirm.

I.  Background

Under familiar principles, we review the evidence and all reasonable inferences that may

be drawn from the evidence in a light most favorable to the Commonwealth as the party

prevailing below.  Garcia v. Commonwealth, 40 Va. App. 184, 189, 578 S.E.2d 97, 99 (2003).

So viewed, the evidence establishes that Danny Gauldin, a police informant, made "controlled

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

buys" of marijuana on three occasions by contacting James Ricky Pruitt, Sr. with a request to purchase the drugs. On two of the three occasions, Gauldin completed the purchase. In each of those instances, Pruitt put Gauldin in touch with his son, James Ricky Pruitt, Jr. ("Little Ricky"), who transacted the sale and gave the profits to his father. Three witnesses testified to the transactions: Gauldin, Gauldin's co-worker, Investigator Terry Barker, and Little Ricky. Video and audiotapes of the transactions were also admitted.

Their testimony, corroborated by the video and audiotapes, established that, on June 21, 2001, after police installed a hidden video camera in Gauldin's truck and placed a hidden audio tape recorder and an audio transmitter on his person, Gauldin went to Pruitt's jobsite, Pruitt's Body Shop. In response to Gauldin's request to purchase marijuana, Pruitt agreed to sell marijuana to Gauldin for $100 per ounce, but directed Gauldin to return to the body shop after 6:00 p.m. to make the purchase. He gave Gauldin two telephone numbers to call. There is no evidence that Gauldin in fact purchased any marijuana on that date.

On June 27, Gauldin called Pruitt to ask if he could "line something up." Pruitt, reiterating his prior directions, told Gauldin to come to the body shop after 6:00 p.m. to make the purchase. The police again equipped Gauldin with a hidden video camera, audio tape recorder, and audio transmitter. The police also searched Gauldin to make certain marijuana was not concealed on his person or in his truck and to determine the amount of cash he had. The police also gave him the funds to use in making the purchase.

When Gauldin arrived at the body shop, Little Ricky entered his truck while Pruitt spoke to Gauldin at the driver-side door. Pruitt said he would stay at the body shop and "talk to his buddies" while Gauldin and Little Ricky went to get the marijuana. Little Ricky directed Gauldin to drive to a "Piggly Wiggly" store. Little Ricky took the purchase money from Gauldin and entered the store while Gauldin waited in the truck. After Little Ricky returned with the

marijuana, the two drove back to the body shop. Little Ricky put the marijuana on top of a briefcase in the truck and exited.

On July 3, 2001, Gauldin again called Pruitt with a request to buy marijuana. Pruitt agreed to sell him two ounces of the drug for $200. Gauldin, equipped as before and subjected to the same control measures, went to the body shop in his truck. Little Ricky entered the truck, and the two men drove to the same Piggly Wiggly store. Little Ricky went into the store where he purchased the marijuana using the money provided by Gauldin. He again transferred the marijuana to Gauldin once they returned to the body shop.

To address the Commonwealth's case that Pruitt caused Little Ricky to distribute marijuana, defense counsel cross-examined Gauldin about certain statements Little Ricky purportedly made about his role in consummating the sales. The Commonwealth objected on the ground that the questions called for hearsay, and the trial judge sustained the objection over defense counsel's argument that the testimony was admissible under the *res gestae* exception to the hearsay rule. Defense counsel preserved his objection, proffering that he would have asked Gauldin:

> whether or not [Little Ricky] made remarks to him that "this boy [Little Ricky's source], he's the one who makes me famous;" [and] referring to his father, "he ain't got the right connections like I do, I got boys that will hook you up, if you want pot call before 5:00 o'clock." After he had delivered it to him, "that is the way I can get it for you any time you need it." He said, "he's gonna have some coming in, that's some good," expletive, "s-h-i-t, at a good price," and on the first occasion, on . . . June 27th he said, "Any time you do business do it through me because I know the way my Pop is." On July 3rd a question by Mr. Gauldin, "He ain't got no problem with that?" Answer, "No, he better not, I'll whip his ass." And then a statement by [Little Ricky], "There's my Daddy, and say I went with you to look at a job, alright." Those were the questions that we wanted to cross-examine Mr. Gauldin about as to whether or not were made by [Little Ricky].

Testifying as part of the Commonwealth's case, Little Ricky denied discussing a possible sale of marijuana with Gauldin prior to the time he got into Gauldin's truck on June 27. He explained that his father, Pruitt, knew that he had a source from which to obtain marijuana; that on June 27, Pruitt came to him and told him of Gauldin's request to purchase marijuana; and that Pruitt asked him to obtain the marijuana for Gauldin. Little Ricky agreed to do so and described the transaction, noting that, after obtaining $100 from Gauldin for an ounce of marijuana, he paid his source $85 or $90 for the drugs, and gave the profit from the sale to his father.

Little Ricky further testified that the July 3 transaction was arranged in "almost the exact same way it happened the first time." Pruitt told Little Ricky that Gauldin "liked what he got the first time" and that Gauldin again wanted to purchase marijuana. Pruitt asked Little Ricky if he could get the marijuana for Gauldin. Little Ricky conducted the sale and gave the profits to Pruitt.[1] Asked by defense counsel if he thought Pruitt was responsible for his "being in trouble," Little Ricky replied, "I would never have been selling to Dan Gauldin if [Pruitt] hadn't first set me up selling to him."

Pruitt was tried by jury on January 15, 2003 and found guilty of both charges. The jury fixed his sentences at ten years and imposed a $100,000 fine for each charge. By order entered March 7, 2003, the trial court suspended five years of each of the sentences and vacated the fines. From this judgment, Pruitt now appeals.

---

[1] The Commonwealth also established that Little Ricky sold Gauldin marijuana on three other occasions after the two described in his testimony, but that Pruitt had not been involved in those sales. They thus were not material to the prosecution of the charges in the instant case. Little Ricky explained that, after the first two sales, he concluded Gauldin was "okay to deal with." He thus told Gauldin to call him directly for future purchases "instead of going through Daddy." Little Ricky retained the profit from these sales.

II.  The Hearsay Evidence Was Properly Excluded

Pruitt contends that Little Ricky's statements, as proffered by defense counsel, were improperly excluded because they fall within the *res gestae* exception to the hearsay rule.  We disagree.

> "Hearsay is an out-of-court statement offered to prove the truth of the matter asserted."  Garcia v. Commonwealth, 21 Va. App. 445, 450, 464 S.E.2d 563, 565 (1995) (*en banc*) (citing Tickel v. Commonwealth, 11 Va. App. 558, 564, 400 S.E.2d 534, 538 (1991)).  "'Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.'"  Stevenson v. Commonwealth, 218 Va. 462, 465, 237 S.E.2d 779, 781 (1977) (quoting McCormick on Evidence § 246 (2d ed. 1972)).

Taylor v. Commonwealth, 28 Va. App. 1, 9, 502 S.E.2d 113, 117 (1998) (*en banc*).  It is undisputed that the proffered out-of-court statements were offered to prove the truth of the matter asserted, viz., that Little Ricky had contact with a source for the drugs sold to Gauldin and that it was his idea, not Pruitt's, to sell them to Gauldin.  If believed, the statements rebutted the Commonwealth's proof that Pruitt caused Little Ricky to sell marijuana to Gauldin.

Constituting hearsay, the statements were properly excluded because, contrary to his contention, Pruitt failed to establish the statements came within the *res gestae* exception to the rule.  See id. at 10, 502 S.E.2d at 117 (stating that the party seeking to rely on the exception has the burden of proving its admissibility).

> The "*res gestae* exception" has become a collective reference to a number of separately identifiable exceptions, the common denominator of which is that the declarant uttered the statement spontaneously and without deliberation. . . .  "The spontaneity of the [declaration] is the guaranty of its trustworthiness in substitution of that provided by oath and cross-examination."

Jones v. Commonwealth, 11 Va. App. 75, 83, 85, 396 S.E.2d 844, 849, 849-50 (1990) (quoting Chappell v. White, 182 Va. 625, 633, 29 S.E.2d 858, 861 (1944)) (alteration in original); see also

Charles E. Friend, The Law of Evidence in Virginia §§ 18-16 through 18-20, pp. 780-800 (6th ed. 2003). There is a presumption that the offered statement was not spontaneous. Friend, *supra* p. 780 (citing Nicholaou v. Harrington, 217 Va. 618, 622, 231 S.E.2d 318, 322 (1977); Jones, 11 Va. App. at 85, 396 S.E.2d at 850).

Little Ricky's statements at issue in this appeal do not qualify as *res gestae* statements; they bespeak deliberation and constitute the product of thought and planning, not spontaneity. The statements, both by their repetitive nature and their content, reflect Little Ricky's considered attempt to circumvent his middleman, Pruitt, and to induce Gauldin to purchase drugs from him directly. In short, the stimulus for the statements was not the "facts of the event[s] in question[,] voicing themselves though the participants or observers." Jones, 11 Va. App. at 87, 396 S.E.2d at 851. The stimulus for the statements emanated from Little Ricky's calculated effort to promote his business as a drug dealer and to "cut the defendant out" of the profits from the sales.[2]

Indeed the facts of this case parallel those in Jones. In Jones, this Court held certain hearsay statements were not admissible under the *res gestae* exception and reversed a conviction for distributing cocaine. Id. at 88, 396 S.E.2d at 851. Jones's girlfriend, Gaskins, conducted a narcotics sale while Jones sat in the back room of his apartment weighing additional cocaine on his scales. See id. at 79, 396 S.E.2d at 846. As evidence of Jones's participation in the cocaine distribution, the Commonwealth introduced, and the trial court admitted, Gaskins's statement to the purchaser that "if her boyfriend was not there, [the purchaser] would have gotten a better deal." Id. at 79, 396 S.E.2d at 846. We reversed Jones's conviction, holding that the statement had been erroneously admitted under the *res gestae* exception, for which it did not qualify

---

[2] The Commonwealth's evidence, in fact, established that Little Ricky was ultimately successful in his effort to end his father's involvement in his drug sales to Gauldin after the completion of the first two.

because "[t]he statement itself evinces deliberation.  At a minimum, it does not overcome the presumption that it was deliberative."  Id. at 87, 396 S.E.2d at 851.

The deliberative import of Little Ricky's statements in the present case is even more compelling than those in Jones.  They not only describe his effort to capture the drug sale business as his sole enterprise, they do so repeatedly over the course of several weeks.  To ascribe spontaneity to such statements would be to turn the principle of *res gestae* on its head.

Affirmed.